UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


OWNER-OPERATOR INDEPENDENT    )
DRIVERS ASSOCIATION, INC., et al.,    )
        Plaintiffs,    )
   )
     vs.    )       1:98-cv-457-SEB-JMS
   )
MAYFLOWER TRANSIT, INC.,    )
        Defendant.    )


**ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S
RENEWED MOTION FOR SUMMARY JUDGMENT AS TO ALL NAMED
PLAINTIFFS**


This cause comes before the Court on the Renewed Motion for Summary

Judgment as to All Named Plaintiffs [Docket No. 31], filed by Defendant, Mayflower

Transit, Inc. ("Mayflower"), pursuant to Federal Rule of Civil Procedure 56.  Plaintiff

drivers assert that Mayflower violated federal motor carrier leasing regulations by failing

to timely return fuel tax credits to them within forty-five days after the expiration of their

lease agreements with Mayflower and Mayflower's agents.  Plaintiffs also allege that

Mayflower's practice of retaining the fuel tax credits constitutes conversion and breach of

contract under Indiana law.

In this motion, Mayflower contends that it is entitled to summary judgment on all

of the named plaintiffs' federal claims.[1]  The parties accept that the claims of the original

---

[1] Though several of our previous entries in this matter have jointly addressed issues in
both of the two pending actions between the parties – cause numbers 1:98-cv-457-SEB-JMS
("Case No. 457") and 1:98-cv-458-SEB-JMS ("Case No. 458") – this entry addresses only the
(continued...)

named plaintiffs are time-barred, in accordance with our ruling of December 14, 2004.

Mayflower asserts that the claims of the newly named plaintiffs are unsupported by any

evidence that they were owed any fuel tax credits by Mayflower at the time they

terminated their lease agreements.  Mayflower contends that because these named

plaintiffs' federal claims are legally deficient, we should decline to exercise jurisdiction

over their state law claims as well.  In addition, Mayflower challenges the merits of the

owner-operators' state law claims.  Plaintiffs assert that the newly named plaintiffs'

federal and state claims are viable and that they have adduced sufficient evidence to

survive Mayflower's summary judgment motion.

## Factual and Procedural Background

We have, on numerous prior occasions, outlined the facts underlying this dispute.

Therefore, we outline them only briefly herein in order to provide sufficient background

to understand the instant motion.  Mayflower is an "authorized carrier"[2] engaged in the

business of transporting goods nationwide via tractor-trailers owned and operated by

independent contractors (referred to herein as "owner-operators").  Plaintiff Owner-

Operators Independent Drivers Association, Inc. ("OOIDA"), which is a class

---

[1](...continued)
most recent Motion for Summary Judgment filed by Mayflower in Case No. 457.

[2] Because Mayflower is a motor carrier authorized under federal law, its lease agreements
and those of its authorized agents are governed by federal regulations.  49 C.F.R. § 376.12(m);
Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, Inc., 204 F.R.D. 138, 141 (S.D. Ind.
2001).

representative in each of the pending actions, is a nonprofit association comprised of such

owner-operators.  Plaintiffs Marc Dudgeon, Anne Weber Neidig, Wood-Chuck Leasing,

Inc., William Owen, and Timothy Corwin are representative plaintiffs in both actions.[3]

### *Fuel Tax Credit Accounts*

Individual owner-operators, including the named representative plaintiffs,

contracted with Mayflower or its authorized agents, entering into written leases which are

governed by federal statute, 49 U.S.C. §§ 14102 *et seq.*, and regulated by the Department

of Transportation's leasing regulations at 49 C.F.R. § 376 (the "leasing regulations").

The crux of the case at bar (Case No. 457) concerns lease provisions related specifically

to fuel tax credit accounts.  The purpose of these accounts is to distribute to the respective

states the amounts that each owner-operator owes in fuel taxes to each state in which the

owner-operator purchases or consumes fuel.  As explained in detail in our prior entries,[4]

owner-operators are individually responsible for paying fuel taxes, but do not pay the

taxes directly.  Rather, they provide Mayflower with driver logs and fuel purchase records

from which Mayflower then calculates the taxes the owner-operators owe in each state,

and makes payments for fuel taxes owed on a fleet-wide basis.

---

[3] We permitted Plaintiffs to substitute Anne Weber Neidig as a representative plaintiff in place of her husband, former representative plaintiff John Neidig, following his death.  Plaintiffs Owen and Corwin, to whom Mayflower refers as "the new plaintiffs," were named as additional representative plaintiffs in our order of March 29, 2005.

[4] See, e.g., Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, Inc., 227 F.Supp.2d 1014, 1016-17 (S.D. Ind. 2002) (providing a thorough description of the function of these fuel tax credit accounts and the "charge-back" procedure).

Mayflower, either directly or through its agents, charges the owner-operators on a state-by-state basis for any additional fuel taxes owed in each state. These "charge-backs" are deducted from the owner-operators' compensation. However, any credits due to an owner-operator for *overpayment* of fuel taxes in a particular state are not credited to the owner-operators' statements; instead, Mayflower retains those funds as a "credit carryover balance" for the length of the owner-operator's relationship with Mayflower, plus three additional years following lease termination. If an owner-operator owes additional fuel taxes in a particular state during a future fuel tax reporting period, Mayflower will only apply a credit previously accrued to that owner-operator in that particular state; in other words, Mayflower will not apply a "carry-over" credit that an owner-operator has in one state to that owner-operator's tax obligation in another state. 227 F.Supp.2d at 1017.

Three years after an owner-operator terminates its relationship with Mayflower or its authorized agent, Mayflower returns the tax credit to the owner-operator only if the owner-operator does not owe money to Mayflower for any other purpose. In addition, Mayflower credits the amount to the statement of its authorized agent, and does not ensure that the credit is eventually returned to the owner-operator who paid the taxes. Mayflower also does not pay interest on the fuel tax credits for the time it retains them; therefore, it enjoys the time-value of the moneys that it carries over in fuel tax credits during the course of the owner-operator's employment and for three years thereafter. The owner-operators assert that Mayflower's practices relating to fuel tax credits violate 49

4

C.F.R. § 376.12(k)(6), which requires that a carrier return funds held in escrow[5] within

forty-five days following the termination of the lease.[6]  They also assert state law breach

of contract and conversion claims stemming from Mayflower's fuel tax credit practices.

### Procedural History Relevant to the Instant Motion

On November 5, 2001, we certified classes of plaintiffs in both Case No. 457 and

Case No. 458.  See Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc.,

204 F.R.D. 138 (S.D. Ind. 2001).  In Case No. 457, we certified a class consisting of:

> all independent truck owner-operators ("Owner-Operators") who entered into
> regulated leases with Mayflower, directly or indirectly through Mayflower's
> agents, and who have each paid money into an escrow or "cash deposit"
> account held by Mayflower or its agents, and/or have had state fuel-tax credits
> withheld by Mayflower or its agents, and who in good faith may assert that
> Mayflower unlawfully refused to rebate the moneys deducted from their
> compensation.[7]

In our entry, we made clear that the certified classes in both actions "will be limited to

members who assert timely actions."  Id. at 145.  We conditioned class membership on

---

[5] In our entry of October 8, 2002, we held that Mayflower had retained the fuel tax
credits in an escrow fund as defined by 49 C.F.R. § 376.2(*l*), and that the forty-five-day
requirement was therefore applicable.  See Owner-Operator Indep. Drivers Ass'n, 227 F.Supp.2d
at 1019.

[6] The owner-operators initially argued that Mayflower's fuel tax credit practices also
violated 49 C.F.R. § 376.12(f), which requires that carriers submit payments to owner-operators
within fifteen days after submission of necessary documents.  In our entry of October 8, 2002,
we held that the fuel tax credit moneys were not "payments" as that term is contemplated in the
regulation, and therefore granted summary judgment in Mayflower's favor as to that claim.  See
Owner-Operator Indep. Drivers Ass'n, 227 F.Supp.2d at 1019-20.

[7] Id. at 149.

compliance with the applicable statutes of limitations, and ordered the parties to either stipulate to or submit further briefing regarding the statutes of limitations relevant to the owner-operators' federal and state claims.  Id. at 149-50.

On October 8, 2002, we granted summary judgment to the owner-operators with respect to their claim that Mayflower's retention of fuel tax credits violated the federal leasing regulation requirement[8] that funds held in escrow be returned by the carrier within forty-five days after the termination of the lease.  See Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc., 227 F.Supp.2d 1014 (S.D. Ind. 2002).  We denied the owner-operators' summary judgment motion as to their state law conversion claim, holding that they had not presented sufficient evidence that Mayflower knowingly or intentionally exerted unauthorized control over their property.  Id. at 1020-21.

We further considered the statute of limitations issues underlying the owner-operators' federal and state claims in our December 14, 2004 entry.  See Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc., 2006 WL 4552833 (S.D. Ind. 2004).[9]  Upon further briefing by the parties in response to our class certification order, we determined that a limitations period of two years (rather than four years, as the owner-operators contended) was applicable to the owner-operators' federal claims under the applicable statute.  Therefore, we ruled that any of the federal claims that had accrued

---

[8]See 49 C.F.R. § 376.12(k)(6).

[9] Though our order was entered on December 14, 2004, the Westlaw citation thereof reflects that it was entered on July 7, 2006, for reasons that are unknown to us.

prior to April 2, 1996, were time-barred.[10]

On September 27, 2005, we determined that Plaintiffs' state law claims for breach of contract and conversion were not appropriate for class treatment, and accordingly decertified the classes as they related to the state law claims. However, we denied Mayflower's motion to decertify Plaintiff's federal claims, holding that class treatment of those claims continues to be appropriate. See Entry on Motion to Decertify Classes (Sep. 27, 2005).

In our entry of June 1, 2006, we granted partial summary judgment to Plaintiffs, holding that Mayflower could be held absolutely liable under the federal leasing regulations for the actions of its authorized agents occurring during the course of those agents' transactions with owner-operators on behalf of Mayflower. See Entry on Plaintiffs' Motion for Partial Summary Judgment (June 1, 2006). On June 27, 2006, we denied Plaintiffs' Motion for Partial Judgment on the Pleadings regarding counterclaims raised by Mayflower in response to Plaintiffs' allegations.

---

[10] In addition, regarding Plaintiffs' pendent state-law-based breach of contract claims, we held that Indiana's ten-year statute of limitations would apply absent an enforceable provision to the contrary or a choice-of-law issue contained within a particular contract, and that the limitations period applicable to the pendent conversion claims was two years. We ordered additional briefing as to two issues: whether class certification for Plaintiffs' breach of contract claims was appropriate, given the fact-sensitive determinations dependent on the terms of each individual contract, and whether the Indiana conversion statute should be applied to plaintiffs who were allegedly injured while Mayflower was located in Indiana, rather than to plaintiffs who suffered *injury* in Indiana.

***The Instant Motion***

In its Renewed Motion for Summary Judgment as to All Named Plaintiffs,[11] Mayflower asserts that it is entitled to summary judgment as to all of the named plaintiffs' federal claims in this cause, as the claims of the original named plaintiffs are time-barred, and the claims of "new" plaintiffs Owen and Corwin are legally deficient. Mayflower further asserts that we should decline to exercise supplemental jurisdiction over the named plaintiffs' pendent state law claims for conversion and breach of contract, or, in the event that we opt to retain jurisdiction over the state law claims, that those claims are also not legally viable.  Finally, Mayflower maintains that named plaintiff OOIDA should be dismissed because it lacks the requisite associational standing to remain a party plaintiff in this case.  Plaintiffs, not surprisingly, dispute Mayflower's contentions, arguing that the claims of Owen and Corwin based on the federal leasing regulations and breach of contract are legally valid, that there is no reason to dismiss Plaintiffs' state law claims on jurisdictional grounds nor on their merits, and that OOIDA has associational standing.

---

[11] Mayflower initially filed its Motion for Summary Judgment as to All Named Plaintiffs on December 15, 2003.  On March 30, 2005, due to the recent joinder of new individual plaintiffs Owen and Corwin, we ruled that Mayflower's motion was "withdrawn from further consideration and denied without prejudice to the movant's refiling this motion or a comparable variant at some later time in the development of this litigation."  Entry of March 30, 2005.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

9

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  <u>Waldridge v. Am. Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  <u>See</u> <u>Shields Enterprises, Inc. v. First Chicago Corp.</u>, 975 F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Ziliak v. AstraZeneca LP</u>, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323.

## II.    Plaintiffs' Federal Claims

The parties in a rare moment of agreement accept that, in accordance with our ruling that a two-year statute of limitations applies to Plaintiffs' federal claims, the federal claims of named plaintiffs Dudgeon, Wood-Chuck, and Neidig are time-barred.  Def.'s Mem. at 5; Pls.' Resp. at 4.  The parties dispute, however, the viability of the federal claims brought by the "new" representative plaintiffs who were designated in March 2005, Timothy Corwin and William Owen.

William Owen entered into a lease agreement with Mayflower agent Martin

Moving Systems in August 1997, and another lease agreement with Mayflower agent
Dodge Moving & Storage Company in April 1998.  Def.'s Exs. F, G.  Owen asserts that
he was owed approximately $705.00 in fuel tax credits when he terminated his final lease
agreement in August 1998, and that those credits have not been refunded to him.  Owen
states that he contacted Mayflower in late 1998 to request a return of his fuel tax credits,
but was informed that Mayflower would not return the credits for three years; he
maintains that he has never received any reimbursement from Mayflower or a Mayflower
agent of the fuel tax credits owed him.  Pls.' Resp. at 2; Owen Aff. ¶¶ 4-8.  Owen cites, in
support of his assertion, a Mayflower document entitled "Credit Balances for Drivers
Who Cancelled Three Years Ago for the Month Ended 08/98," which reflects a $702.06
total credit balance for driver #46759 (whom Owen asserts is he).  Pls.' Ex. B.

Timothy Corwin entered into a lease agreement with Mayflower in November
1997.  He also entered into separate lease agreements with Mayflower agents Glen Ellyn
Storage Corporation, in February 1998, and Dodge Moving and Storage Company, in
June 1998.  Def.'s Mem. at 4; Def.'s Ex. H; Pls.' Ex. E.  Corwin asserts that he was owed
approximately $142.00 in fuel tax credits when he terminated his final lease agreement in
December 1999. Pls.' Resp. at 2.  Corwin did receive a refund from Mayflower of
$141.78 in April 2003.  Corwin Aff. ¶ 5; Pls.' Ex. C.  However, he asserts a federal claim
against Mayflower on the basis that "no accrued interest was paid on the amount
withheld."  Pls.' Resp. at 2.  Corwin cites, in support of his assertion, a Mayflower
document entitled "Mayflower Transit Credit Balances, Cancelled Agent Drivers for

11

01/00," which reflects a $141.78 balance in the "credit driver" column for driver #46880 (whom Corwin asserts is he).  Pls.' Ex. D.

Mayflower maintains that the claims brought by Corwin and Owen are legally defective because neither Corwin nor Owen has timely presented any evidence demonstrating that Mayflower actually owed them fuel tax credits.  As Mayflower characterizes it, "[a]n essential element of [the plaintiffs'] claim is proof that net fuel tax credits were in fact due and owing to each of them when they terminated their lease agreements with Mayflower or a Mayflower agent."  Def.'s Mem. at 6.  As we have previously described, Mayflower's policy is to return tax credits three years after the termination of the owner-operator's contract, but only if the owner-operator does not owe money to Mayflower for any other purpose.  Mayflower asserts that, because Owen and Corwin cannot make a showing sufficient to establish this necessary element of their case – that they suffered a compensable net monetary loss as a result of Mayflower's purported actions – it is entitled to summary judgment as to each of their federal claims.[12]

Mayflower emphasizes that it has, in several previous filings in this case, pointed out that neither Owen nor Corwin had adduced any evidence in support of their

---

[12] Mayflower further asserts as to plaintiff Corwin, who received a refund check and whose federal claims relates only to interest purportedly owed on the $141.78 refund amount, that such an amount is truly nominal; the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14704(a)(2), upon which plaintiffs' federal claims are based, requires actual damages. See Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc., 339 F.3d 1001, 1012 (8th Cir. 2003) (stating that the carrier would not "be liable for returning funds if, for example, the Owner-Operator were offset by other monies owed to [the carrier] or [its agent]").  However, Mayflower does not appear to dispute that Corwin was not, in fact, paid accrued interest on his fuel tax credit balance.

allegations that they were owed fuel tax credits by Mayflower; yet "even in the face of these filings, over a period of several years, Owen and Corwin remained silent and pointed to no documentary or other evidence to support their bare assertion that Mayflower was liable to them for alleged undistributed fuel tax credits."  Def.'s Reply at 4.  Mayflower contends that Owen and Corwin were obligated to provide such information as part of their mandatory disclosures pursuant to Federal Rule of Civil Procedure 26.  See Fed. R. Civ. P. 26(a)(1)(C) (requiring a party to make an initial disclosure, "without awaiting a discovery request," of "a computation of any category of damages claimed by the disclosing party" including the documents on which such computation is based).  Mayflower asserts that Owen and Corwin had a duty to supplement their earlier responses to Mayflower's discovery requests after they were designated party plaintiffs, even though Mayflower did not serve discovery requests specifically addressed to them.[13]  When a non-movant bears the burden of proof on an essential element of his or her claim, vague assertions of possible future proof as to that element are insufficient to survive summary judgment.  See Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001).

Plaintiffs Owen and Corwin maintain that Mayflower has neither sought to depose nor served written discovery requests upon them since they were designated

---

[13] Rule 26(e) requires a party who has made a disclosure to supplement its disclosures if it learns that "in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

representative plaintiffs; therefore, Plaintiffs maintain that "it is not clear when Plaintiffs would have presented" evidence demonstrating that Mayflower owed them a refund. Pls.' Resp. at 5. Moreover, Plaintiffs assert that documents produced by Mayflower itself – namely, the "credit balance" documents discussed above – belie Mayflower's argument that there is no evidence that Owen and Corwin were owed money.

### Corwin's Claim

Plaintiff Corwin's claim – that he was damaged by Mayflower's failure to pay him accrued interest on his withheld tax credit balance – cannot survive Mayflower's summary judgment motion. Corwin asserts summarily that "[n]o accrued interest was paid on the amount of the fuel tax credit that was refunded to [him]" (Corwin Aff. ¶ 5), but references no evidence whatsoever tending to establish an amount Mayflower purportedly owes him.

Though neither party cites it in their briefings, it appears from our own research that 49 C.F.R. § 376.12(k)(5) is the relevant regulation here, as it addresses the accrual of interest on escrow funds such as the fuel tax credit accounts at issue in this dispute. That regulation provides in relevant part that:

> [T]he lease shall specify . . . [t]hat while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. For purposes of calculating the balance of the escrow fund on which interest must be paid, the carrier may deduct a sum equal to the average advance made to the individual lessor during the period of time for which interest is paid. The interest rate shall be established on the date the interest period begins and shall be at least equal to the average yield or equivalent

14

coupon issue yield on 91-day, 13-week Treasury bills as established in the weekly auction by the Department of Treasury.[14]

Corwin neither cites the relevant regulation in his brief nor makes any attempt to substantiate his claim for interest with reference to the calculations required by the regulation, as Rule 26(a)(1)(C) requires.  He has not provided any calculations, dates, or information on the relevant yields on Treasury bills so that we (or he) might calculate the amount of interest, if any, that he is owed by Mayflower on his fuel tax credit balance.  Further, because the regulation requires that interest be paid on an escrow fund on at least a quarterly basis, one would need to know the balance in his account *throughout* the life of the account, not just the balance at the termination of his lease, which is all that Corwin has provided here.  The only assertion Corwin makes in support of his claim is that his final fuel tax credit balance was $141.78 when he terminated his final lease agreement in December 1999,[15] and that "although he received a refund, no accrued interest was paid on the amount withheld."  Pls.' Resp. at 2.  This is Corwin's claim in its entirety.  Much more information is necessary to substantiate such a claim – particularly at this late stage in the litigation and on summary judgment – and any factfinder would be at a loss to determine whether and what his asserted damages might be.

By all indications, however, the amount of interest that Mayflower could

---

[14] 49 C.F.R. § 376.12(k)(5).

[15] As we have stated, Mayflower does not appear to dispute the accuracy of the $141.78 figure.  This figure is supported by the Mayflower-produced credit balance worksheet and the check stub provided by Corwin.  Pls.' Exs. C, D.

conceivably owe to Corwin is nominal or *de minimis*.  Though, as we have described, we are without sufficient information to calculate what the amount might be with specificity, the interest on Corwin's ending balance of $141.78 would certainly be quite small and would not merit a trial.  Corwin's vague and unelaborated assertions of a *de minimis* entitlement to payment from Mayflower are insufficient to surmount Mayflower's motion for summary judgment.  Therefore, Mayflower's motion is <u>GRANTED</u> as to Plaintiff Corwin's federal claim.

### *Owen's Claim*

In contrast, Plaintiff Owen – who asserts that Mayflower never reimbursed him at all for his $702.06 final tax credit account balance – does adduce enough evidence to survive Mayflower's motion.  In support of his claim, Owen provides two pieces of evidence: his affidavit asserting that he was owed approximately $705.00 in fuel tax credits when he terminated his final lease agreement in August 1998, which had not, to date, been refunded, even after he contacted Mayflower about the reimbursement; and the internal Mayflower credit balance listing, which reflects a total final credit balance for Owen of $702.06.  Mayflower disputes the significance and meaning of its credit balance document.  It asserts that the document does not demonstrate that Owen did not owe Mayflower any other monies which should properly be deducted from the final credit balance due him.

Based on the evidence before us, we are unable to reach a conclusion as to the

16

precise meaning or significance of the $702.06 figure on the Mayflower worksheet.  The
document is not self-explanatory and does not indicate what deductions, if any, may have
been taken from the driver's credit balance account in consideration of debts owed to
Mayflower for any other purpose.  Neither Owen nor Mayflower has adduced any
evidence (i.e., an affidavit or deposition testimony from the maker of the document)
indicating the significance of the figures therein.  Since the evidentiary record has not
been developed as to the nature of the credit balance document, material facts in
controversy remain as to the amount, if any, of fuel tax credits owed by Mayflower to
Owen.  Because the credit balance document constitutes *some* evidence in support of
Owen's claim, and because Mayflower does not appear to dispute that it never reimbursed
Owen *any* amount in reconciliation of his fuel tax credit account (nor has it explained
whether it had determined that it did not owe him any reimbursement, if that were the
case), Owen's claim is sufficient to survive Mayflower's motion for summary judgment.
Thus, Mayflower's motion is <u>DENIED</u> as to Plaintiff Owen's federal claim.

***Applicability of Corwin's and Owen's Individual Claims to the Class***

Though the parties have expended significant effort addressing the sufficiency of
Owen's and Corwin's individual claims, it is unclear from their briefings the extent to
which these two individual claims reflect the nature of the claims of the other members of
the class.  We are unable to discern if Plaintiffs mean to assert that, for example, Plaintiff
Corwin's claim for accrued interest is typical of the claims of the class; or, perhaps, that

Plaintiff Owen's claim – that he never received any reimbursement whatsoever of his fuel tax credit balance – is representative of the class's claims.  Plaintiff Corwin's claim for interest appears to us to be insufficient to buttress such claims; a vague claim for undetermined (but certainly *de minimis*) damages such as Corwin's cannot establish an adequate foundation for the claims of the class.  However, without knowledge of the type of claim being brought by class members besides Owen and Corwin, we are unable to apply such a holding more broadly than only Owen's claim.

Similarly, we are unable to determine the means by which Plaintiffs seek to establish such entitlements.  Do Plaintiffs aim to demonstrate a claim as to each class member by means of an internal Mayflower credit balance worksheet, such as those submitted to us with respect to both Plaintiffs Corwin and Owen (but, as we have discussed, which do not in themselves conclusively establish the basis for a claim)?  We are not able to extrapolate from the documents cited by Plaintiffs as to the existence of similar documents for all class members, and are lacking sufficient information regarding whether such documents form the basis of an entitlement.

Therefore, though we have determined that Plaintiff Owen's individual claim survives, and Plaintiff Corwin's individual claim does not, we cannot determine the extent to which these rulings ought to be applied to other members of the class without further delineation of the types of claims being brought by other class members.  In order to determine the applicability of our rulings as to the federal claims of Owen and Corwin to the other members of the class, we <u>DIRECT</u> Plaintiffs to inform the Court, within

18

twenty (20) days of the date of this entry, of the effect of the instant rulings by the Court on the claims of the class, and upon what evidence Plaintiffs intend to rely in order to substantiate class-based relief.

## III.   Plaintiffs' State Claims[16]

### A.   Plaintiffs' Conversion Claims

In its brief, Mayflower argues that summary judgment should be entered in its favor against the named Plaintiffs' statutory conversion claims under Indiana law.[17]  The thrust of Mayflower's argument is that the conversion claims of the original named plaintiffs (Dudgeon, Wood-Chuck, and Neidig) are time-barred, pursuant to our entry of December 14, 2004, and that the conversion claims of the "new" named plaintiffs (Owen

---

[16] Mayflower maintains that, upon the dismissal of Plaintiffs' federal claims, we should decline to adjudicate Plaintiffs' pendent state-law-based breach of contract and conversion claims pursuant to our discretion under 28 U.S.C. § 1367(c)(3), and in consideration of the fact that, as conceded by Plaintiffs in other briefings, the federal claims in this cause are "paramount" to the state claims.  Def.'s Mem. at 6-7.  Because certain of Plaintiffs' federal claims survive, Mayflower's argument for declining jurisdiction must fail.  We note, however, that even if we had disposed of all of Plaintiffs' federal claims, the fact that we have already committed considerable judicial resources to this cause over the past nine years makes this litigation a textbook example of a situation in which a district court should *retain* supplemental jurisdiction over pendent state law claims.  See Miller Aviation v. Milwaukee County Bd. of Supervisors, 273 F.3d 722, 732 (7th Cir. 2001) (reversing the district court's relinquishment of jurisdiction over pendent state law claims when the district court had considered twenty-two motions, held nine hearings, and issued nineteen orders over more than five years overseeing the litigation, due to the fact that a remand of the remaining supplemental claims to state court "would require a 'duplication of effort' by the state court that undermines the very purpose of supplemental jurisdiction – judicial efficiency").

[17] As we have described earlier in this entry, we vacated class certification as to the conversion claims in our entry of September 27, 2005.  Therefore, the sole remaining conversion claims are those of the individually named plaintiffs in this litigation.

and Corwin) are faulty because, among other reasons, those plaintiffs did not suffer injury while Mayflower's operating tax department was located in Indiana.[18]

During the pendency of Mayflower's summary judgment motion, we issued an entry (on March 3, 2006) denying Plaintiffs' motion to alter or amend our order vacating class certification as to the conversion claims. In the entry, we held that Plaintiffs had failed to establish an adequate class representative to assert a conversion claim on behalf of the class, and discussed why none of the proposed representatives had standing to assert a conversion claim. Though Plaintiffs maintain their objections as to some of our factual and legal findings underlying our entry of March 3, 2006, they essentially concede in their brief that, given our ruling, Mayflower is entitled to summary judgment as to the conversion claims. Pls.' Resp. at 6-7. Therefore, having previously resolved this issue in our prior ruling, Mayflower's present motion regarding Plaintiffs' conversion claims is DENIED as moot.

**B.      Plaintiffs' Breach of Contract Claims**

Mayflower also seeks summary judgment on Plaintiffs' claims based on breach of

---

[18] Mayflower moved from Indiana to Missouri at some point in 1997. The exact date at which the move occurred is disputed by the parties, though we stated in our entry of March 3, 2006 that Defendant's assertion that the move occurred in April 1997 "stands uncontroverted." Plaintiffs Owen and Corwin signed their respective lease agreements after this date, Owen signing his first of two leases in August 1997, and Corwin signing his first of three in November 1997. Defs.' Mem. at 9; Entry of March 3, 2006 (as to Owen).

contract.[19]  In support of its motion, Mayflower makes two arguments: first, that the

contracts of the original plaintiffs (Dudgeon, Wood-Chuck, and Neidig) contain

enforceable contractual time limits for asserting claims, which have passed; and second,

that none of the named plaintiffs' lease agreements contain terms requiring Mayflower to

return fuel tax credits within any prescribed period of time.  We consider each of

Mayflower's arguments in turn below.

### 1.    *Contractual Time Limitations*

In our prior entries, we have noted that several of the contracts between plaintiffs

and Mayflower or Mayflower's agents contain provisions relating to time limits for

asserting claims under the contracts, as well as choice of law provisions to be applied in

determining the enforceability of contract provisions.  See Entry of September 27, 2005 at

4; Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc., 2006 WL 4552833,

at *5-*6 (S.D. Ind. 2004).  The lease agreements signed by Plaintiffs Dudgeon, Wood-

Chuck, and Neidig contain such clauses.

Each of these three plaintiffs signed leases with Glen Ellyn Storage Corporation

(see Def.'s Exs. A, C, E), each of which contains a provision stating that: "The

Independent Contractor shall not entertain an action or suit against the Company

contesting the status of his account prior to the final settlement of such account nor

---

[19] As with Plaintiffs' conversion claims, we vacated class certification as to the breach of
contract claims in our entry of September 27, 2005.  Therefore, the sole remaining breach of
contract claims are those of the individually named plaintiffs in this litigation.

21

subsequent to the elapse of two years following the final settlement of such account."

See, e.g., Def.'s Ex. A Art. 23 ¶ 5.  The Glen Ellyn leases each state that they "shall be construed according to the laws of the state in which the principal place of business of the Company is located" (Id. Art. 25), which, in the case of Glen Ellyn, is Illinois.

Plaintiff Dudgeon also signed a lease with Mayflower (Def.'s Ex. B) which contains a lease provision essentially identical to the time limitation in the Glen Ellyn leases, except that the time limitation period is one year following the final settlement of the account.  Id. Art. 24 ¶ 5.  The Mayflower lease states that it is to be construed in accordance with the laws of Indiana.  Id. Art. 27.

Finally, Plaintiff Neidig signed a lease with Gazda Transportation System, Inc. (Def.'s Ex. D) which contains an identical (one-year) lease provision as that in the Mayflower/Dudgeon lease.  Id. Art. 23 ¶ 5.  The choice of law provision in that lease was left blank.  Id. Art 28.  Mayflower suggests (and Plaintiffs do not controvert) that the law of either Illinois or Minnesota applies, in accordance with caselaw regarding choice of law when the forum is not specifically designated.  See Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc., 2006 WL 4552833, at *6 n. 11 (S.D. Ind. 2004), quoting Employers Ins. of Wausau v. Recticel Foam Corp., 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).  Illinois was Neidig's state of residence, while Minnesota was where Gazda was headquartered and the location of Neidig's principal office, as well as the state in which the contract was negotiated and entered into.  Def.'s Mem. at 13 n. 9.

Mayflower asserts that the contractual time limits in each of these five contracts

22

are valid and enforceable, and that the contract claims of Dudgeon, Wood-Chuck, and Neidig are time-barred under these provisions.[20]  Plaintiffs respond that these contractual limitations are unenforceable for reasons of public policy, and, even if enforced, Plaintiffs Neidig and Wood-Chuck still made their claims within the time period provided.

*Enforceability*

We find without difficulty that all five of the contractual limitations provisions at issue are enforceable.  Plaintiffs argue that the contracts at issue here are "the product of a fundamental inequality of bargaining power" (Pls.' Resp. at 7) between the owner-operators and Mayflower or its agents, and note that when a contractual provision shortens the limitations period afforded by a federal statute, the provision must be consistent with the policies underlying the statute.  Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 874 (7th Cir. 1997).  Further, the provision must provide a reasonable period of time for bringing suit.  Schafer v. Buckeye Union Ins. Co., 381 N.E.2d 519, 522 (Ind. Ct. App. 1978); Doe, 112 F.3d at 874 ("If the contractually compressed period is unreasonably short, this creates a suspicion that the plaintiff was gulled or coerced by the defendant when the contract was made.").

The provisions at issue here, construed under the laws of the states governing the respective contracts, are reasonable and thus enforceable.  We note, first, that "Indiana

---

[20] All of the relevant lease agreements of these three plaintiffs terminated on or before January 10, 1996.  This lawsuit was filed on April 2, 1998, more than two years after the termination of each lease.  Def.'s Mem. at 13.

choice of law doctrine favors contractual stipulations as to governing law."  Owner-

Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc., 2006 WL 4552833, at *6 n.

11 (S.D. Ind. 2004), quoting Allen v. Great American Reserve Ins. Co., 766 N.E.2d 1157,

1162 (Ind. 2002).  Further, the caselaw of each of the states at issue – Illinois, Indiana,

and Minnesota – supports enforcement of contractual time limits like those at issue here.

See, e.g., Village of Lake in the Hills v. Illinois Emcasco Ins. Co., 506 N.E.2d 681, 683

(Ill. App. 1987) ("Parties to a contract may validly agree to set a reasonable time limit

within which a suit on the contract must be filed.") (construing Illinois law); Taylor v.

Western and Southern Life Ins. Co., 966 F.2d 1188, 1203 (7th Cir. 1992) ("[C]ontractual

limitations of action are generally upheld under Illinois law."); New Welton Homes v.

Eckman, 830 N.E.2d 32, 35 (Ind. 2005) ("Indiana law generally holds that contractual

limitations shortening the time to commence suit are valid, at least so long as a reasonable

time is afforded.") (internal quotation marks omitted); Michael Foods, Inc. v. Allianz Ins.

Co., 2003 WL 1956294 (D. Minn. 2003), at *2 ("Minnesota law . . . permits parties to a

contract to shorten [the limitations] period, provided no statute prohibits the use of a

different limitations period, and that any time fixed is not unreasonable.").

        Moreover, Plaintiffs have not demonstrated that one- or two-year contractual

limitations periods are unreasonably short.  Indeed, the caselaw in each relevant

jurisdiction demonstrates that a one-year contractual time limit is reasonable and

enforceable – even in situations in which there ostensibly would be some degree of

inequality in bargaining power between the contracting parties.  See, e.g., Atwood v. St.

24

Paul Fire and Marine Ins. Co., 363 Ill.App.3d 861, 864 (Ill. App. 2006) (one-year provision in Illinois insurance contract); Village of Lake in the Hills, 506 N.E.2d at 683 (same); New Welton Homes v. Eckman, 830 N.E.2d 32, 35 (Ind. 2005) (one-year provision in Indiana contract for purchase of a manufactured home); Jacobsen v. North Star Mut. Ins. Co., 1995 WL 46211, at *3 (Feb. 7, 1995) (one-year provision in Minnesota insurance contract).  Plaintiffs have provided no evidence to distinguish these cases or otherwise bolster their assertion that such time limits are unreasonable; their argument on this ground cannot succeed.

Plaintiffs' contentions regarding consistency with the federal regulations are similarly unavailing.  As we have previously held, the statute of limitations to which Plaintiffs' federal claims are subject is two years.  Clearly, the two-year term contained within the three Glen Ellyn contracts is entirely consistent with that statute of limitations.  And, as we have described above, the one-year term contained within the Gazda and Mayflower contracts provides a reasonable time for a party to sue and cannot be shown to be inconsistent with the federal regulation.  See Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 874 (7th Cir. 1997) ("The dominant view in contract law is that contractual limitations periods shorter than the statute of limitations are permissible, provided they are reasonable. . . . We think that the dominant view is right because it is consistent with the principle of party autonomy that underlies the law of contracts[.]").

Therefore, for the reasons described above, we hold that each of the disputed contractual limitations clauses is enforceable, and proceed to Plaintiffs' next argument –

that certain Plaintiffs did bring their claims within those time limits.

*Construction*

Plaintiffs object that Mayflower has misconstrued the contractual time limits contained in Wood-Chuck's lease with Glen Ellyn, and in Neidig's leases with Glen Ellyn and Gazda.  As we have described, the relevant provisions require that any suit brought contesting the status of an account must be brought within one or two years "following the final settlement of such account."  Plaintiffs argue that the only reasonable interpretation of the phrase "final settlement of such account" is that all credits and debits on the owner-operator's account are cleared, and there is a zero remaining balance.  Since Mayflower's policy is not to refund fuel tax credits for three years after the termination of a lease, an account with a fuel tax credit balance is not finally settled until such credits are returned.  Otherwise, the owner-operator would be without legal remedy for the failure of Mayflower and/or its agent to return fuel tax credits.  Plaintiffs maintain that, if the provision is construed such that final settlement does not occur until three years *after* the end of the lease term, the claims brought pursuant to these three leases are timely.  Pls.' Resp. at 9-10; Def.'s Ex. C Art. 25 ¶ 5 (Wood-Chuck/Glen Ellyn); Def.'s Ex. D Art. 25 ¶ 5 (Neidig/Gazda); Def.'s Ex. E Art. 23 ¶ 5 (Neidig/Glen Ellyn).

Mayflower counters that Plaintiffs' interpretation is faulty because the lease agreements provide that "final settlement" take place no later than 45 days after lease termination.  In support of its assertion, Mayflower points to provisions in the "Cash

26

Deposit" articles of the lease agreements.  In the cited section of the Neidig/Gazda lease, the contract requires that the owner-operator post a cash deposit of twenty-five hundred dollars with the company, and provides that "[t]he Company will make *final settlement* and provide a final accounting *of the Contractor's cash deposit account* within forty-five (45) days of effective date of cancellation or termination."  Pls.' Ex. L, Art. 18 (Neidig/Gazda) (emphasis added).  The cash deposit section of the Wood-Chuck/Glen Ellyn lease, however, provides that "[u]pon cancellation or non-renewal of this Agreement, [Wood-Chuck]'s cash deposit account shall first be applied to any debit amount in [Wood-Chuck]'s statement account and any balance remaining shall be paid to [Wood-Chuck] within 45 days of termination of this Agreement."   Pls.' Ex. J, Art. 17 (Wood-Chuck/Glen Ellyn).  Neidig's lease with Glen Ellyn contains identical language. Pls.' Ex. I, Art. 17 (Neidig/Glen Ellyn).

Mayflower dubiously asserts that the lease agreements "all explicitly provide" that the "final settlement" of an account must occur within 45 days of lease termination as dictated by these cash deposit clauses, but the cited clauses in the Glen Ellyn leases do not even contain the term "final settlement."  Moreover, it is clear that the clauses cited by Mayflower pertain only to settlement of cash security deposit accounts, *not* the fuel tax credit accounts at issue here.  The clauses cited by Plaintiffs, which provide that suits may not be brought after a certain period following "final settlement of such account," appear to pertain more generally to the entire lease agreement.  Further, we agree with Plaintiffs that it is disingenuous for Mayflower to assert that Plaintiffs must have brought their fuel

27

tax credit claims *before* Mayflower's settlement of those accounts three years after lease termination – it seems to us that it would be impossible for Plaintiffs to do so.  Therefore, we conclude that Plaintiffs Neidig and Wood-Chuck's breach of contract claims are not time-barred by the provisions of their leases.[21]

### 2.     *Whether a Breach Occurred*

Finally, Mayflower asserts that Plaintiffs cannot identify any written contract term which Mayflower allegedly breached by retaining fuel tax credits following lease termination.  In a previous filing, Plaintiffs have argued that "the specific substantive issue that constitutes the breach of contract" is the leases' "failure to disclose that the owner-operators' fuel tax credits would be withheld for three years."  Pls.' Opp. to Def.'s Supp. Mem. in Further Support of its Mot. to Vacate Conditional Class [Docket No. 380], at 10-12.  Mayflower asserts that an alleged obligation which appears nowhere in the parties' contracts cannot form the basis of a claim for breach of contract.

Plaintiffs do not dispute Mayflower's assertion, but instead shift gears and rely on the language cited above regarding cash deposit accounts – specifically, the provisions requiring that cash deposit account balances be returned to an owner-operator within 45 days of lease termination – in support of their breach of contract claims.  But, as we have described above, the cash deposit accounts described in the leases are distinct from the

---

[21] Plaintiffs have not asserted that Plaintiff Dudgeon brought his claims in a timely fashion, even under their prevailing interpretation of the contractual time limits.  Therefore, because we have held that the contractual time limits are enforceable under Illinois and Indiana law, Plaintiff Dudgeon's breach of contract claims are time-barred.

fuel tax credit accounts at issue here.  As the 45-day cash deposit account provision does not bear on contractual time limitations for suit, as explained, neither does it provide a basis for a breach of contract action based upon fuel tax credit accounts.

Plaintiffs lean on the fact that, in the later leases of Plaintiffs Owen and Corwin, the term "escrow fund" is used in place of "cash deposit account."  See Pls.' Ex. G ¶ 10 (Owen/Dodge), Pls.' Ex. H ¶ 10 (Corwin/Dodge).  However, it is clear (and Plaintiffs concede) that the same accounts are contemplated by these two terms.  Plaintiffs assert that, because we have previously held that the fuel tax credit accounts are escrow funds for purposes of their treatment under the federal regulations, the lease provisions in Owen and Corwin's leases regarding escrow funds must necessarily apply to the fuel tax credit accounts.  This argument is spurious.  It is abundantly clear that the lease provisions on which Plaintiffs rely – which describe the deposit of a discrete cash sum, the amount of which is specified in the contract, from the owner-operator to the contractor – are meant to describe cash deposit accounts only.  Nothing in the leases suggests that the parties intended for such provisions to also encompass fuel tax credit accounts, and our prior ruling does not impact this fact.  Therefore, because Plaintiffs have not specified a lease provision which has been breached, these claims fail as a matter of law.  Accordingly, we GRANT Mayflower's summary judgment motion as to Plaintiffs' breach of contract claims.

**C.    OOIDA's Associational Standing**

Finally, the parties dispute whether OOIDA has associational standing to remain a party plaintiff in this case.  OOIDA, a trade association, never itself entered into a lease with Mayflower or a Mayflower agent.  Mayflower asserts that OOIDA lacks associational standing because none of its members has standing to assert a viable claim against Mayflower.[22]  However, as we have set forth previously in this entry, certain of Plaintiffs' claims survive Mayflower's summary judgment motion.[23]  Therefore, we DENY Mayflower's motion as to Plaintiff OOIDA's associational standing to sue.

---

[22]  In Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 600 (7th Cir. 1993), the Seventh Circuit discussed the associational standing doctrine.  An association which has not itself suffered injury may bring suit on behalf of its members provided that three factors are satisfied: "(a) its members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Id. at 600, quoting Hunt v. Washington Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).  Mayflower's sole developed argument is that OOIDA fails to meet the first prong of the Hunt test.

Mayflower additionally raises a cursory objection to OOIDA's associational standing based on the third Hunt factor, stating summarily that this case "triggers a host of individualized factual and legal issues that vary on a claimant-by-claimant, contract-by-contract, and agent-by-agent basis."  Def.'s Mem. at 16 n. 11.  Mayflower's argument, to which it only devotes a two-sentence footnote in its brief and no mention at all in its reply, is undeveloped, and thus, we neither must devote much time to it here.  See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.  Especially not when the brief presents a passel of other arguments.").  Further, we note that, at this point, we are without the requisite knowledge to determine what sorts of factual and legal inquiries will be required as to the class's federal claims, as we have described earlier in this entry.

[23]  Plaintiff Owen is a current member of OOIDA and has been a member since August 1998.  Pls.' Resp. at 3.

**IV.     Conclusion**

For the reasons detailed in this entry, we <u>GRANT</u> Mayflower's motion for

summary judgment as to Plaintiff Corwin's federal claim and each of the named

Plaintiffs' breach of contract claims.  We <u>DENY</u> Mayflower's motion as to Plaintiff

Owen's federal claim and Plaintiff OOIDA's associational standing to sue.  We <u>DENY</u>

<u>AS MOOT</u> Mayflower's motion regarding the named Plaintiffs' conversion claims.

Finally, we <u>DIRECT</u> Plaintiffs to inform the Court, within twenty (20) days of the date of

this entry, of the effect of the Court's rulings on the claims of the class, and upon what

evidence Plaintiffs intend to rely in order to substantiate its remaining claims for class-

based relief.  We further <u>DIRECT</u> the parties to confer with one another within twenty

(20) days of the date of this entry, and to jointly file a status report reflecting the effect of

this and all our prior rulings to date.  IT IS SO ORDERED.


Date: _____

Copies to:

Joseph Albert Black
THE CULLEN LAW FIRM PLLC
jab@cullenlaw.com

James Albert Calderwood
ZUCKERT SCOUTT & RASENBERGER
jacalderwood@zsrlaw.com

David C. Campbell
BINGHAM MCHALE LLP
dcampbell@binghammchale.com

09/28/2007

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

31

David J. Carr
ICE MILLER LLP
carr@icemiller.com

David Aaron Cohen
THE CULLEN LAW FIRM PLLC
dac@cullenlaw.com

Paul Damien Cullen Sr.
THE CULLEN LAW FIRM PLLC
pdc@cullenlaw.com

James M. Hinshaw
BINGHAM MCHALE LLP
jhinshaw@binghammchale.com

Martha S. Hollingsworth
BINGHAM MCHALE, LLP
mhollingsworth@binghammchale.com

Michael J. Morris
THOMPSON COBURN LLP
mmorris@thompsoncoburn.com

Rebecca A. Pinto
THOMPSON COBURN LLP
rpinto@thompsoncoburn.com

David Wells
THOMPSON COBURN LLP
dwells@thompsoncoburn.com

Margaret Dewey Wielenberg
ICE MILLER LLP
margaret.wielenberg@icemiller.com

Roman P. Wuller
THOMPSON COBURN
One Firstar Plaza
St. Louis, MO 63101