UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

OWNER-OPERATOR INDEPENDENT DRIVERS     )
ASSOCIATION, INC., *et al.*,                           )
     *Plaintiffs*,                                            )
                                                   )     1:98-cv-00457-SEB-JMS
     *vs.*                                                      )
                                                   )
MAYFLOWER TRANSIT, INC.                              )
     *Defendant*.                                             )

## ORDER

Presently before the Court is Plaintiffs' Motion for the Award of Attorneys' Fees and Costs (the "Motion"). [Dkt. 147.]

### A REMINDER ABOUT CIVILITY

For the past eleven years, the parties and their counsel have been engaged in hard-fought litigation of this class action, which they have now resolved by agreement, except as to the issue of attorneys' fees. That was no small feat. Thus, at the fairness hearing, we commended the parties' counsel for the "exceptionally fine lawyering" that was required to accomplish it. [Dkt. 142 at 14.]

Here at the last, however, we must express some disappointment. Lawyers can—and should—zealously advocate for their clients. Yet at all times counsel must keep in mind that they must conduct themselves as professionals. Consequently, their advocacy must never stoop to "disparaging personal remarks [n]or acrimony toward other counsel, parties, or witnesses." Standards for Prof. Cond. Within the Seventh Fed. Jud. Cir., Lawyers' Duties to Other Counsel, Standard 2.[1] Likewise they must never lodge "unfounded accusations of impropriety" against

---

[1] All members of the bar of this Court, including those admitted *pro hac vice*, have agreed to abide by those Standards, which are available on the Court's website. L.R. 83.5(b), (c).

their opponent.  *Id.*, Standard 4.  Unfortunately, the parties' briefs on the present Motion, at times, did both.  Accusations of "extraordinarily misleading—and plainly wrong" claims [Dkt. 153 at 41], of "shameless" conduct [*id.* at 48], of failures of candor [Dkt. 160 at 27], and of "false[] assert[ions]" [Dkt. 161 at 1] litter the briefs.  Such accusations are serious.  *See* Fed. R. Civ. Pro. 11; Ind. R. Prof. Cond. 3.3.  They must not be bandied about cavalierly, as in our view counsel did here.

In this district, the practice of law is to be civil—thereby serving the best interests of counsel, their clients, and the Court.  Though this litigation has now drawn to a close, counsel are admonished to so conduct themselves in the future that their behavior comports fully with the standards of civility espoused and maintained by the Court.  A failure to do so may elicit more than just disappointment from the Court in the future.

## BACKGROUND[2]

At its core, the dispute between the parties centered on the proper timing for Defendant Mayflower Transit, Inc. ("Mayflower") to refund to the drivers the excess fuel taxes that it collected from them as independent truck owner-operators hauling goods nationwide for Mayflower.  As often happens in litigation, however, this case took on a shape different at the end than it had at the beginning.

Originally, Plaintiffs advanced three causes of action:  violations of federal "Truth-in-Leasing" laws, 49 U.S.C. § 14701 *et seq.* and 49 C.F.R. Part 376; a violation of Indiana's criminal conversion statute, Ind. Code § 35-43-4-3 (for which Ind. Code § 34-24-3-1 authorizes a civil action to recover treble damages and attorney's fees); and common-law breach of contract.

---

[2] Over the life of this litigation, we have had numerous opportunities to describe Plaintiffs' underlying claims.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n v. Mayflower Transit, Inc.*, 227 F. Supp. 2d 1014 (S.D. Ind. 2002).  We will, therefore, not exhaustively recount them here.

The scope of the case expanded when we permitted Mayflower to counterclaim against the Plaintiffs, seeking to set-off (and possibly eliminate) any damage award to each class member by the amount of any debt outstanding to Mayflower (as might be, for example, owing under the member's lease with Mayflower).  *Owner-Operators Indep. Drivers Ass'n v. Mayflower Transit, Inc.*, 2006 U.S. Dist. LEXIS 44550, *49 (S.D. Ind. June 27, 2006).

The case contracted in significant ways too.  We de-certified all of Plaintiffs' state-law causes of action and determined that a two-year, as opposed to a four-year, statute of limitations applied to Plaintiffs' federal claims.  *See Owner-Operators Indep. Drivers Ass'n., Inc. v. Mayflower Transit, Inc.*, 2006 U.S. Dist. LEXIS 39827, **3-4 (S.D. Ind. June 1, 2006).

By 2008, the case began drawing to a close when only 236 individuals as members of the class returned claim forms that had been mailed to approximately 3,200 potential claimants.  [Dkt. 153 at 39.]  Those claim forms indicated that Mayflower would be entitled to assert "defensive set-offs" against the claimant, up to and including the full value of the asserted claim, for any unpaid debts the claimant owed Mayflower.  [Dkt. 107 at 3.]  After the claim forms arrived, Mayflower made an offer of judgment for the full value of those 236 claims, without asserting any set-offs.  Plaintiffs accepted Mayflower's offer, and we approved the settlement and entered judgment in Plaintiffs' favor for $194,220.98.  [Dkt. 140.]

### ANALYSIS

The parties agree that Mayflower is obligated to pay Plaintiffs' reasonable attorneys' fees and costs.  Mayflower made, and Plaintiffs accepted, an offer of judgment under Federal Rule of Civil Procedure 68 for violations of the federal Truth-in-Leasing laws, which made Plaintiffs prevailing parties in this litigation.  Although not a settled proposition, *see Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 398 F.3d 1067, 1069 (8th Cir. 2005) (noting that the

-3-

statute does not explicitly apply to prevailing plaintiffs but inferring from the applicable legislative history that it does), Plaintiffs contend—and Mayflower does not dispute—that a prevailing plaintiff under that statutory scheme is entitled to collect as part of its costs a "reasonable attorney's fee," 49 U.S.C. § 14704(e), plus the court costs normally awarded to any prevailing party, *see* Fed. R. Civ. Pro. 54(d)(1) (creating a default rule for the imposition of costs).  Further, Mayflower's offer of judgment expressly contemplated that Mayflower would pay "reasonable attorneys' fees and costs as determined by the Court."  [Dkt. 126-2 at 2.]  The present Motion seeks a judicial determination of reasonable fees and costs, which Plaintiffs assert should be $1,450,867.00.  [Dkt. 148 at 41.]

In contrast to the usual practice regarding claims for attorneys' fees, Mayflower has offered no objections to specific line items set out in the fee request.  For example, Mayflower does not contend that Plaintiffs' counsel overstaffed the case, seeks an excessive hourly fee, or went off on any strategic wild goose chases.  Mayflower explicitly waived all such objections. [Dkt. 153 at 10 n.7.]  Instead, Mayflower argues only two issues that it claims require "significant across-the-board reductions" in any fee award:  what it deems Plaintiffs' unreasonable rejections of several settlement offers greater than their ultimate recovery and their "ultimate lack of success."  [*Id.*]  According to Mayflower, applying those reductions will result in an award of (at most) $500,000.  [*Id.* at 50.]

## A.  General Points About Fee Awards

Before turning to the issues Mayflower has identified, four general points about fee awards deserve to be mentioned.[3]  The first point relates to Mayflower's continued juxtaposition

---

[3] Throughout their briefing, the parties have assumed that the standards applicable to the fee shifting statutes for civil rights litigation, *e.g.* 42 U.S.C. § 1988, apply equally to the present case.  Without definitively resolving the question, we will assume as much as well, except in one

the $194,220.98 recovery received by Plaintiffs with their $1,450,867.00 fee and cost request.[4]
When a lawyer expects the client to foot the bill for the lawyer's services, the lawyer is strongly
incented to exercise appropriate billing judgment—that is, to ensure that the time expended (or at
least charged) for the matter is reasonable, given the client's objectives.  For example, suppose
Plaintiff A has a breach-of-contract claim of $10,000 against B.  The lawyer for A will normally
ensure that the fee charged does not exceed the value of A's claim:

> [I]t would be both extraordinary and unjustifiable, in the absence of any special
> arrangement, for the attorney to put in 200 hours on the case and send the client a
> bill for $25,000.  Such a bill would be 'unreasonable,' regardless of whether A
> obtained a judgment against B for $10,000 or obtained a take-nothing judgment.

*Riverside v. Rivera*, 477 U.S. 561, 593 (1986) (Rehnquist, J., dissenting).  Indeed, in this
example, even charging a $5,000 bill could be unreasonable, depending on the lawyer's
professional estimate of the likelihood that the client would recover the full $10,000 claim.  *Cf.*
*Cole v. Wodziak*, 169 F.3d 486, 488 (7th Cir. 1999) (explaining that a reasonable "tort lawyer
who believes that the victim is sure to recover either $900,000 or $100,000 (with equal
likelihood) would invest up to $200,000 in pursuit of the claim (the $500,000 actuarial value of
the case, times a 40% contingency fee)").

　　　The second point to be made here is equally important.  Continuing with the previous
example, where, as here, a fee-shifting statute applies to Plaintiff A's claim, "Congress has
already determined that the claim was worth bringing.  The court must then assume the absolute
necessity of achieving that particular result and limit itself to determining whether the hours

---

respect.  Plaintiffs have not argued that they are entitled to prejudgment interest on their fee
award, as would be available under 42 U.S.C. § 1988.  *See Missouri v. Jenkins*, 491 U.S. 274,
283-84 (1989).  We will, therefore, also not consider the issue of prejudgment interest.

[4] We note that Plaintiffs additionally claim that Mayflower unilaterally refunded $450,000 in
escrow funds to the class as a result of this litigation.  [Dkt. 148 at 38.]  Mayflower vigorously
denies that the refund had anything to do with this litigation, claiming instead that the refund
reflected a natural evolution in its business and accounting practices.  [*E.g.*, Dkt. 161 at 6-7.]

spent were a reasonable means to that necessary end." *Anderson v. AB Painting & Sandblasting, Inc.*, No. 08-2102, 2009 U.S. App. LEXIS 18709, *9 (7th Cir. Aug. 20, 2009) (footnote omitted). Thus, in contrast to the typical case where no fee-shifting statute applies, "it is absolutely permissible to spend $100,000 litigating what is known to be a $10,000 claim if that is a reasonable method of achieving the result." *Id.* at *10.

The next point grows out of the first two. In cases where a plaintiff knows that its attorneys' fees will ultimately be borne by the defendant, the plaintiff has "little incentive" to rein in counsel. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986). Accordingly, that task ultimately falls to the Court. But "[j]udicial monitoring…is necessarily imprecise. The judge cannot readily see what legal work was reasonably necessary at the time; the judge first sees the application for fees after the case is over, and hindsight may obscure the difficult decisions made under uncertainty as much as it illuminates them." *Id.* at 325. Sometimes, the availability of judicial after-the-fact monitoring of fees cannot stop the proverbial tail wagging the dog, shifting counsel's focus from achieving the client's objectives to churning the case to generate an ever-greater fee from the other side—as we have recently had occasion to lament in another case, *see generally Wickens v. Shell Oil Co.*, 569 F. Supp. 2d 770, 790-91 (S.D. Ind. 2008).

Finally, however, we note that defendants in actions where Congress has enacted a fee-shifting statute do have at least one shield to protect against high fee awards for low-value cases: an offer of judgment under Federal Rule of Civil Procedure 68. "A spurned Rule 68 offer, followed by a lower recovery at trial, precludes an award of costs (including attorneys' fees, when a statute defines them as part of costs) incurred after the offer's rejection." *Cole*, 169 F.3d at 487 (citation omitted).

### B.  Determining the Fee Award Here

When determining a proper fee award, "the analysis begins with the 'lodestar' figure—that is, the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Estate of Enoch v. Tienor*, 570 F.3d 821, 823 (7th Cir. 2009).  From there, we can adjust the presumptive fee award downward (or, in unusual circumstances, upward) to account for the factors set forth in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), which essentially track those set forth in Indiana Rule of Professional Conduct 1.5 delineating a professionally appropriate fee.[5]  Of those factors, the only one that Mayflower invokes is the degree of success obtained or, more precisely, according to Mayflower, not obtained.

### 1.  The Effect of Plaintiffs' Rejections of Mayflower's Previous Settlement Offers

Mayflower's first issue, that Plaintiffs unreasonably rejected its (non Fed. R. Civ. Pro. 68) settlement offers, goes to the lodestar figure.  When a defendant is already voluntarily willing to give the plaintiff what the plaintiff wants, only an unreasonable plaintiff would press on with litigation; any such hours incurred are necessarily unreasonably expended in the litigation and ought not to be charged to the defendant.  That, essentially, is the holding of *Moriarty v. Svec*, a holding that Mayflower discusses at great length:  "Attorney's fees accumulated after a party rejects a substantial offer provide minimal benefit to the prevailing party….[A] district court should reflect on whether to award only a percentage (including zero percent) of the attorney's fees that were incurred after the date of the settlement offer."  233 F.3d 955, 967 (7th Cir. 2000) (citation omitted).[6]  For the purposes of *Moriarty*, a settlement qualifies

---

[5] The Indiana Rules of Professional Conduct apply to members of the bar of this Court.  L.R. 83.5(g).

[6] We note that *Moriarty* is ambiguous as to whether consideration of the settlement offer ought to occur as part of the lodestar calculation (i.e. as to the reasonableness of the hours incurred) or as

as a "substantial" one when "the offered amount appears to be roughly equal to or more than the total damages recovered by the prevailing party." *Id.*

Mayflower identifies six settlement offers that it made, and which Plaintiffs rejected, between 2001 and 2007:

- An $800,000 offer in 2001;
- A $1.2 million offer in 2002;
- A $1.5 million offer in 2003;
- A $2 million offer in 2005;
- A $2.4 million offer in May 2007; and, finally,
- A $3.2 million offer in July 2007.

[Dkt. 153 at 6.]  Mayflower correctly points out that the dollar figure of each of those offers far exceeds the $194,220.98 judgment that we entered.  It concludes, therefore, that each qualifies as a "substantial offer" under *Moriarty*.  And it contends that the Court should award Plaintiffs zero percent of their attorneys' fees incurred after their rejection of the first of those substantial offers, i.e. the May 2001 $800,000 offer.  [*Id.* at 30.]

Plaintiffs vigorously deny that any of those offers are *Moriarty*-type substantial offers. They note that (1) the offers sought a general release of all claims, known and unknown, and including claims unrelated to those raised in this litigation—including claims about insurance

---

a potential reduction after the lodestar calculations are complete.  *See id.* (explaining that a rejected settlement may justify a fee "less than the lodestar calculation" while also explaining that rejected settlement does not necessarily require a modified "lodestar method.")  As some other courts have done, *see Vought v. Teamsters Gen. Union*, 2008 U.S. Dist. LEXIS 67090, **15-16 (E.D. Wis. Aug. 22, 2008), we choose to evaluate the rejected settlement offers when calculating the lodestar in the first instance.  In so doing, we more closely synthesize *Moriarty* (whose continuing validity Plaintiffs have not questioned) with the Seventh Circuit's recent opinion in *Anderson*, 2009 U.S. App. LEXIS 18709.  There, as we discuss later, the court disclaimed any language in *Moriarty* directly linking a plaintiff's ultimate recovery in a case with the reasonableness of the fee request.  *See id.* at **8-9.  Our approach is also consistent with the Supreme Court's command that we exclude from our "initial fee calculation" all hours that were "unnecessary" and would not have been expended with the exercise of reasonable billing judgment.  *Hensley*, 461 U.S. at 434.

-8-

charges that are the subject of other litigation—and (2) the release in each offer would extend to Mayflower's entire corporate family (including entities not parties to this litigation), and not just to Mayflower, without specifying how much each was contributing to the settlement offer. [*See* Dkt. 160 at 8-21.] Their briefing cites cases under Federal Rule of Civil Procedure 68 holding that valid offers of judgment must be limited to the case before the court and, in the case of multiple defendants, must indicate how much of the offer is allocable to each defendant. From those cases, Plaintiffs conclude that we can and should ignore their rejections of Mayflower's settlement offers. [*Id.* at 12, 21.] They also note that they, and Mayflower, have been unable to find a case explicitly undertaking a *Moriarty* analysis for rejected settlement offers that sought to settle claims beyond those at issue in the litigation before the court at the time. [*See id.* at 11.] But Plaintiffs have likewise been unable to find a case explicitly prohibiting a *Moriarty* analysis either.

We believe that Plaintiffs have taken an excessively restrictive view of *Moriarty*, trying to limit it as they do to offers that comport with Federal Rule of Civil Procedure 68. *Moriarty*, 233 F.3d at 967 ("Substantial settlement offers should be considered by the district court as a factor in determining an award of reasonable attorney's fees, even where Rule 68 does not apply."). One half of the lodestar equation requires us to compute the amount of time reasonably spent on the matter. *Tienor*, 570 F.3d at 823. A reasonable litigant will at least consider a "global" settlement along the lines that Mayflower offered. *See Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank,* 1:05-cv-0236-WTL-JDT, 2007 U.S. Dist. LEXIS 82181, **10-11 n.3 (S.D. Ind. Nov. 2, 2007) (explaining that the global nature of the settlement offer is "certainly relevant to Plaintiff's consideration of whether to accept [it...but is] not relevant to the issue framed in *Moriarty*"). Indeed, we note that Plaintiffs implicitly concede as much in their reply

brief.  There, they cite their willingness to accept two global settlement offers that the magistrate judge proposed in 2002 and 2003 (but Mayflower rejected) as evidence of their good-faith and reasonableness in settlement, [Dkt. 160 at 21-22], which they contend justifies the continued use of the lodestar method of calculating fees, *see Cole*, 169 F.3d at 489 (approving trial court's abandonment of lodestar in favor of percentage of recovery because "recovering less than 10% of [claimed damages] is a good reason to curtail the fee award substantially"); *but see Anderson*, 2009 U.S. App. LEXIS 18709 at *5 (noting that permitting reductions for incongruities between claimed damages and requested fees "seems to be losing favor").  Thus, we shall address consider whether the rejection of the settlement offers added any "value" to Plaintiffs' case.  *See Moriarty*, 233 F.3d 955, 967

Contrary to Mayflower's assertions, Plaintiffs' rejection of the 2001 settlement offer did add value to their case.  Had Plaintiffs accepted that $800,000 offer, Plaintiffs would have had only $99,387.83 to distribute to the class,[7] after paying the $700,612.71 for their counsel's accrued costs and fees up until that point.[8]  Rejecting that offer allowed Plaintiffs to consider Mayflower's next offer of $1.2 million in 2002.  That offer, after deducting $759,322.56 in accrued fees and costs, represented a $440,677.44 potential distribution to the class—a substantial increase over Mayflower's last offer.  The trend continued for each of Mayflower's remaining four offers:

---

[7] Because Mayflower wanted to settle on a "global" basis, the "class" represented in the offers discussed in this paragraph is larger than the class that we certified.  Mayflower's offers depended upon expanding the scope of that class and/or creating additional classes, to effectuate a global settlement.

[8] We note that Plaintiffs report that their counsel took this matter on a "partial contingency fee basis."  [Dkt. 150-1 at 8, ¶32.]  Neither side has provided us with the particulars of that arrangement.  But because Defendant's calculations about the rejected settlement offers assume that Plaintiffs' counsel would be paid dollar-for-dollar for all incurred fees and costs from any settlement, [*e.g.* Dkt. 153 at 16], so will ours.

| Offer Date | Offer Amount | Plaintiffs' Fees and Costs | Potential Class Distribution |
|---|---|---|---|
| 2003 | $1,500,000 | $ 961,547.06 | $ 538,452.94 |
| 2005 | $2,000,000 | $1,133,533.93 | $ 866,466.07 |
| May 2007 | $2,400,000 | $1,250,015.30 | $1,149,984.70 |
| July 2007 | $3,200,000 | $1,272,968.42 | $1,927,031.58 |

The increasing potential class distributions are even more remarkable, given (as Mayflower aptly notes) that "this Court's rulings consistently narrowed the scope of [Plaintiffs'] claims and dramatically lessened [their] potential damages" during that timeframe.  [Dkt. 153 at 7.]

Until July 2007, it is easy to see the increased value to the class that each rejection of Mayflower's settlement overtures conferred.  But after that last rejection, we can discern no reasonable value from that strategy—and Plaintiffs' briefs are conspicuously silent about any claimed benefit that the rejection brought about.  True, 236 members of the class that we certified submitted claim forms.  And, thanks to Mayflower's $194,220.98 offer of judgment, those 236 members received 100% of the fuel credits that they claimed had not been timely returned to them.  But approximately 3,000 other class members who were mailed claim forms did not return them (perhaps, as Mayflower suspects, because they believed that Mayflower's off-sets exceeded their claims, or perhaps because of apathy often typical of members of large classes).  Those members received nothing.  Under Mayflower's July 2007 offer, they would have received something—even if they had to also give up, for example, claims in the insurance litigation currently on appeal to the Seventh Circuit (for which we found no recovery appropriate).

When viewed *ex ante*, perhaps the rejection of the July 2007 settlement offer might have been a strategically appropriate decision, assuming that *ex ante* justifications are sufficient, *compare Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 592 (7th Cir.

2000) ("Since a defendant must take seriously a large demand and prepare its defense accordingly, it is right to penalize a plaintiff for putting the defendant to the bother of defending against a much larger claim than the plaintiff could prove.") and *Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir. 1988) ("It is fair to judge a pudding by the eating, and fair to judge litigating decisions by their results."), *with Cole*, 169 F.3d at 488 (explaining that a low recovery does not necessarily mean that the lawyer unreasonably valued the case). But Plaintiffs have offered no evidence or argument on that score, despite bearing the burden to prove the number of hours reasonably incurred in this litigation, *see Spegon v. Catholic Bishop*, 175 F.3d 544, 550 (7th Cir. 1999) ("The party seeking the fee award bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed." (citation omitted)). Viewed *ex post*, and from the perspective of the many class members who received nothing, Plaintiffs' decision was unreasonable; a bird in the hand was, in this instance, indeed worth two in the bush.

From the evidence before us, Plaintiffs consistently overvalued their claims, at least in their settlement posturing toward Mayflower. For example, despite several significant adverse rulings in the meanwhile—including the decertification of state-law claims and the selection of a shorter statute of limitations in this case and our dismissal of the insurance case—Plaintiffs had only reduced their November 2001 global settlement demand of $9,447,394 to $9,000,000 by March 2007. [*See* Dkt. 154-2 at 11; 154-10 at 6.]

Plaintiffs' strategy of puffing up the value of their case in settlement talks was also high risk one, and it was one that likely delayed settlement. So long as that strategy was providing benefits to the class, however, we will not penalize Plaintiffs for employing it. But once that strategy led to the collapse of the July 2007 settlement talks, it becomes appropriate to cut off any fee and cost award. Plaintiffs' continued use of that strategy then provided no benefit to

anyone, including the Court.  Accordingly, we determine the lodestar fee and cost amount to be $1,272,968.42, the amount of fees and costs incurred as of July 18, 2007.  [Dkt. 153 at 27.]  We find all fees and costs incurred after that point neither reasonable nor necessary, and we will not authorize their recovery.  *See Moriarty*, 233 F.3d at 967; *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 642 (7th Cir. 1991) (explaining that a court need not award costs under Fed. R. Civ. Pro. 54(d) that are not "reasonable and necessary").

### 2.   The Degree of Plaintiffs' Success

Having determined that Plaintiffs' counsel reasonably incurred $1,272,968.42 in fees and costs to litigate this case, we now turn to Mayflower's second issue.  That issue is whether we should adjust the lodestar amount downward given what Mayflower contends was counsel's limited success in this matter.  As Mayflower correctly notes, a plaintiff's lack of success may justify a reduction in the fee award from the lodestar amount.  *Hensley*, 461 U.S. at 434 ("The product of reasonable hours times a reasonable rate does not end the [fee] inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'results obtained.'" (footnote omitted)).

### a.   Limitations on Attorney's Fees Under *Farrar*

Evaluating a plaintiff's degree of success involves two inquiries. The first inquiry asks whether, despite technically obtaining a judgment in its favor (or a small settlement), a plaintiff obtained such limited success that the victory is a nominal one.  In words, it asks whether, even in winning, the plaintiff lost.  In such cases, according to the Supreme Court's decision in *Farrar v. Hobby*, where the plaintiff obtained a $1 verdict on a $17 million claim, we should usually award no attorney's fee at all.  506 U.S. 103, 115 (1992) ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary

-13-

relief…, the only reasonable fee is usually no fee at all." (citation omitted)).  The only exceptions to that rule would be where the "case established an important precedent, decreed declaratory or injunctive relief, or otherwise conferred substantial benefits not measured by the amount of damages awarded."  *Hyde v. Small*, 123 F.3d 583, 584 (7th Cir. 1997) (citations omitted).  Even then, an award might be significantly less than what the lodestar might otherwise call for.  *See Farrar*, 506 U.S. at 114-15.

Until relatively recently, the law in this Circuit was clear as to when a recovery was so minimal, even though not technically "nominal," to trigger *Farrar*.  The plaintiff had to recover at least ten percent of the demand, *Perlman v. Zell*, 185 F.3d 850, 859 (7th Cir. 1999) ("[A] litigant who wins less than 10% of his initial demand either is not a prevailing party for purposes of fee shifting statutes or should be treated as if he had not prevailed."); *Cole*, 169 F.3d at 488 (approving an 85% reduction in requested fees because "recovering less than 10% of the demand is a good reason to curtail the fee award substantially").  Because, Mayflower says, Plaintiffs (as a group) ultimately obtained a judgment worth far less than 10% of their claimed damages— approximately 3% of their 2001 demand—we should jettison the lodestar approach altogether and "drastically reduce" the fee request.  [Dkt. 153 at 43.]

The *Perlman* and *Cole* line of cases do not, however, necessarily represent sturdy authority.  *Farrar*, after all, concerned itself with truly nominal damages—a pittance awarded because of a failure to prove actual damages.  *Farrar*, 506 U.S. at 115.  Further, more recent Seventh Circuit cases have explicitly backed away from *Perlman* and *Cole*.  For example, in *Tuf Racing*, the Seventh Circuit questioned whether those cases truly establish a "rule" that a reduction is required, or whether a lesser recovery should more properly be understood as "merely as a factor to consider along with other factors weighing for or against an award of

-14-

attorneys' fees." *Tuf Racing*, 223 F.3d at 592.   Indeed, the Seventh Circuit has recently reaffirmed what it has "repeatedly" stated before:   "[F]ees must [not] be calculated proportionally to damages.   The principle applies equally to purported disproportionality between the relief requested and that received." *Tienor*, 570 F.3d at 823 (quotation omitted). And just last month, the Seventh Circuit noted that the "proportionality" between demand and recovery that was embraced in *Perlman* and *Cole* "seems to be losing favor," *Anderson*, 2009 U.S. App. LEXIS 18709 at *5 (*citing Tienor*, 570 F.3d at 822-23, which it describes as holding that "recovering less than 7% of amount sought is not reason to apply *Farrar* if damages are not nominal")).

According to *Anderson*, a disparity between the amount of the fees requested and the damages requested (or recovered) is merely a "red flag" that may signal inefficient litigation or unreasonable litigation strategies. *Anderson*, 2009 U.S. App. LEXIS 18709 at **8-9 ("[S]mall claims can be complex and large claims can be very straightforward.   So while a fee request that dwarfs the damages award might raise a red flag, measuring fees against damages will not explain whether the fees are reasonable in any particular case.").   That concern is not, however, a valid one here.   As indicated above, Mayflower has waived all such claims, except with respect to Plaintiffs' rejection of Mayflower's settlement offers.[9]

Because the concerns underpinning the *Perlman* and *Cole* line of cases does not apply, we see no reason to apply whatever "rule" that those cases otherwise invoke.   Besides, the "rule," if it exists at all, may not even apply as a factual matter.   Plaintiffs claim that they are

---

[9] Accordingly, we will not consider Mayflower's vague claim that Plaintiffs "filed ill-conceived" motions that "needlessly delayed final resolution."   [Dkt. 153 at 44-45.]   In the absence of specific argument explaining how particular motions delayed final resolution—and, more importantly, by how much—we note our general view that this action moved along as quickly as reasonably possible, given the unique evidentiary challenges, at least until the failed July 2007 settlement conference.

responsible for Mayflower voluntarily distributing over $450,000 in escrow funds to the class over and above the judgment that we entered, which, when added to that judgment, pushes Plaintiffs' recovery to more than 10% of their demand in 2002 for $6 million.  [Dkt. 154-5 at 2.]

To the extent that *Perlman* and *Cole* do apply and to the extent that they merely authorize us to consider departing from the lodestar method (assuming that Mayflower's 3% recovery figure is to be preferred over Plaintiffs' 10%+ figure), we still see no compelling reason to depart from the lodestar method.  The lodestar establishes the amount of hours reasonably required to prosecute this action.  Despite the relatively small amount of the 236 class members' claims, we must—as Congress has commanded by authorizing fee shifting—"assume the absolute necessity of achieving" recovery for those claims.  *Anderson*, 2009 U.S. App. LEXIS 18709 at *9. Departing from the lodestar, and awarding counsel less than what was reasonably required to litigate this matter, would be inconsistent with that congressionally required mindset given that the 236 claimants obtained—as Mayflower concedes [Dkt. 153 at 40]—a full recovery for their actual damages under the Truth-in-Leasing provisions.[10]

The 236 claimants here were not awarded a legal pittance because they failed to prove any actual damages.  If any of their awards (averaging about $800 each) could be described as a pittance at all, the award could only be described that way because the claimant had a small claim to begin with—which is no reason to apply *Farrar*, jettison the lodestar calculations, and deny fees, *see Fletcher v. City of Fort Wayne*, 162 F.3d 975, 976 (7th Cir. 1998) ("[A] plaintiff with a small claim who achieves a complete recovery is entitled to fees, because civil rights laws entitle victims of petty violations to relief." (citation omitted)).

---

[10] Because we decertified the state law cause of action, the claimants could not recover treble damages.  Even accounting for that fact, the 236 claimants still obtained 33% of their "best" recovery, which is more than the 10% figure so important under *Perlman* and *Cole*.

Accordingly, we find no basis to depart from the lodestar method of calculating a fee award in this case under *Farrar*.

### b.   Reduction for Unsuccessful Claims

The second prong of the degree-of-success inquiry asks whether the plaintiff "fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded."  *Hensley*, 461 U.S. at 434.  Claims are "related" for *Hensley* purposes when they "involve a common core of facts" and the legal theories reasonably implicated by those facts, whether or not every legal theory turned out to be successful.  *Id.* at 435; *see also Jaffee v. Redmond*, 142 F.3d 409, 414 (7th Cir. 1998)("[W]e have recognized that courts may award fees for time reasonably spent on an unsuccessful argument in support of a successful claim....[T]he touchstone in such a case is not whether a particular argument was successful, but rather whether it was reasonable." (citations omitted)).   Unrelated claims are to "be treated as if they had been raised in separate lawsuits,...and no fee may be awarded for services on the unsuccessful claim."  *Hensley*, 461 U.S. a 434-35.  In the face of unrelated claims, "the district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment."  *Id.* at 436-37.

Mayflower discusses at great lengths the adverse rulings to Plaintiffs that we entered in this case (chiefly, the decertification of state-law causes of action and the application of a two-year statute of limitations).  [*See, e.g.*, Dkt. 153 at 37-51.]  It does not, however, argue that these setbacks reflect work on "unrelated claims" for *Hensley* purposes, at least not explicitly.   And we do not think that those losses represent unrelated claims.  The state law claims and the federal Truth-in-Leasing claims share a common core of facts—i.e. when, if ever, did Mayflower refund the credits to Plaintiffs.  Further, the dispute over the statute of limitations for the federal claim

was a pure question of law on an otherwise successful claim for Plaintiffs. *See Kurowski*, 848 F.2d at 777 ("[A] losing argument in support of a successful claim for relief is fully compensable time." (citation omitted)).

Nonetheless, some reduction under this prong of the lack-of-success inquiry is required. If the certified class had consisted solely of the 236 individuals who ultimately submitted claim forms, Mayflower would be hard pressed to claim that Plaintiffs failed to obtain a favorable result in this case. Those 236 members did, after all, recover 100% of their tax credits, with interest. [Dkt. 137-2 at ¶9.] Yet a problem arises because approximately 3,000 individuals— whom counsel believed were class members—received claim forms but ended up receiving no money at all (owing to their failure to return the claim form).[11] Thus, Plaintiffs' counsel only obtained a successful result on approximately 7% of the "claims" remaining in the case after our rulings (236 claimants obtaining recovery / 3200 total claimants). The remaining 93% could have opted out of this action and brought their own suit for those claims. [*See* Dkt. 61 (approving class notice).] If the 93% had done so, based on this record, they would have obtained no recovery—therefore they would have been ineligible to obtain any attorneys' fees from Mayflower.

It would be a very curious thing, indeed, if counsel were entitled to a fee for representing that 93% in this case, when counsel would not have been entitled to a fee for having represented them in separate litigation. We do not think that the law of fee shifting is nearly so curious; Plaintiffs' counsel's failure to obtain a successful result for them does not entitle counsel to fees attributable to their presence in the class. *Cf. Tuf Racing*, 223 F.3d at 592 ("[C]ase law indicates that…if [plaintiff] had incurred attorney's fees that were disproportionate to a reasonable

---

[11] The offer of judgment did not contemplate that money potentially owed to members who did not return claim forms would be placed into a *cy pres* fund.

estimate of the value of its claim, it could not recover all those fees, but only the reasonable proportion, which is to say[,] the amount that would have been reasonable to incur had the value of the claim been estimated reasonably rather than extravagantly." (citations omitted)).  We will, therefore, deduct from the lodestar amount the marginal cost that those extra class members imposed on this litigation, while permitting counsel to recover the fixed costs of litigating on behalf of the first 236 class members.  *See Ustrak v. Fairman*, 851 F.2d 983, 988-89 (7th Cir. 1988) (noting that even if plaintiff had only asserted the one claim on which he prevailed, "[t]he defendant would still have had to be deposed").

Mayflower offers us no help in determining the marginal cost of adding approximately 3,000 more members to this litigation beyond a class limited to the 236 who obtained (full) recovery.  [*See* Dkt. 153 at 50 (asking that we reduce any award "by a substantial percentage" to account of Plaintiffs' lack of success).]  That failure is chargeable to Mayflower.  *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) ("A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable fee' is wholly consistent with the rationale behind the usual fee-shifting statute…."); *Robinson v. City of Harvey*, 489 F.3d 864, 872 (7th Cir. 2007) (noting that party opposing the lodestar bears the burden of proof).[12]  Given the difficulties inherent in calculating "elusive counterfactual" scenarios about how much time could have been saved had a case been litigated differently, *Ustrak*, 851 F.2d at 989, and given our burgeoning docket, it would be inappropriate for us to comb through the voluminous record in this case and consider every instance where things might have gone more quickly had the class only contained 236

---

[12] *See also Tuf Racing*, 223 F.3d at 592 (not reducing a fee award where the defendant had not "shown" that the claim would have been litigated differently had plaintiff's counsel valued the case differently).

members. *See generally Smith v. Eaton*, 910 F.2d 1469, 1470-1471 (7th Cir. 1990) ("Especially now, when the court system is burdened to capacity, and when judicial resources are stretched to the very limit, our fiduciary duty to the institution we serve and to all the litigants who come before us requires that we be vigilant in enforcing the bar's responsibility to present issues clearly and comprehensively.") (footnote omitted)).

Nonetheless, we are certain that adding approximately 3,000 class members imposed some marginal cost (if for no other reason, counsel had to take time to review documents relating to the amount of their possible damages). Some reduction is, therefore, in order. Because class actions necessarily involve common questions of fact and law, *see* Fed. R. Civ. Pro. 23, we will assume—in the absence of evidence to the contrary—that the marginal cost of their presence was a small one. Based on our experience in this case, and others, we assess it at 10% of the lodestar; anything more would be speculation.

To account for Plaintiffs' counsel's recovery of damages for only 236 class members, we will reduce the lodestar figure by 10%, bringing it to $1,145,671.58.

### CONCLUSION

Mayflower notes that, in 2001, it estimated that its exposure in this case was $277,309, a figure much closer to the actual judgment that we entered than was Plaintiffs' estimation at the time. [Dkt. 153 at 14.] Had Mayflower filed an offer of judgment in that amount back then, the resolution of this Motion would have been quite different. But it did not do that. Instead, this litigation continued for another eight years—but at a pace that Mayflower does not dispute was reasonable, except insofar as Plaintiffs rejected Mayflower's settlement demands. Accounting for that failure to settle, and excluding expenses attributable to litigating this action as a class

-20-

containing more than just 236 members, a reasonable award of costs, including reasonable attorneys' fees, for Plaintiffs is $1,145,671.58.  The judgment will so reflect.

Date:  09/15/2009

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

David J. Carr
carr@icemiller.com

David Aaron Cohen
dac@cullenlaw.com

Joseph Albert Black
jab@cullenlaw.com

Paul Damien Cullen , Sr.
pdc@cullenlaw.com

Ryan Christopher Metzing
ryan.metzing@icemiller.com

David C. Campbell
dcampbell@binghammchale.com

David Wells
dwells@thompsoncoburn.com

James Albert Calderwood
jacalderwood@zsrlaw.com

James M. Hinshaw
jhinshaw@binghammchale.com

Martha S. Hollingsworth
mhollingsworth@binghammchale.com
Michael J. Morris
mmorris@thompsoncoburn.com

Roman P. Wuller
THOMPSON COBURN
One Firstar Plaza
St. Louis , MO 63101
(314) 552-6000